IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,              :
                                       :
                    Plaintiff,         :
                                       :
                                       :    Criminal Action No. 06-06 KAJ
                                       :
RASHAN J. BAUL,                        :
                                       :
                    Defendant.         :

## GOVERNMENT'S POST-HEARING OPENING BRIEF
## ON DEFENDANT'S MOTION TO SUPPRESS

COLM F. CONNOLLY
United States Attorney

Douglas E. McCann
Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

DATED:        October 30, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ................................. 1

STATEMENT OF FACTS .................................................... 1

ARGUMENT ............................................................. 6

I. THE EVIDENCE OBTAINED IN THE SEARCH SHOULD NOT BE SUPPRESSED ..... 6

A.    Standard of Review ..................................................... 6

B.    The Applicable Legal Standard Is "Reasonable Suspicion" ...................... 6

C.    Probation Had Reasonable Suspicion To Conduct The Search ..................... 8

D.    Any Alleged Failure in Procedure Does Not Undermine The Validity of the Search ... 10

      1.    Delaware's Probation policies create no private right for the defendant. ...... 11

      2.    The Knights decision establishes that strict compliance with search policies
            is not required. ................................................... 13

CONCLUSION ........................................................... 14

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Griffin v. Wisconsin, 483 U.S. 868 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Samson v. California, 126 S.Ct. 2193 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Caceres, 440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,13

United States v. Bowers, No. 04-133 KAJ, 2006 WL 1537378 (D.Del. June 5, 2006) . . . . . . . . 6

United States v. Grant,  256 F.Supp.2d 236 (D.Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Knights, 534 U.S. 112 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,14

United States v. Williams, 417 F.3d 373 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 7,8,13,14

**STATE CASES**

Fuller v. Delaware, 844 A.2d 290 (Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATE STATUTES**

11 Del.C. § 4321(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

The United States, by and through Colm F. Connolly, United States Attorney for the District of Delaware, and Douglas E. McCann, Assistant United States Attorney for the District of Delaware, hereby files its opening post-hearing brief on defendant Rashan J. Baul's Motion to Suppress. D.I. 18.

## NATURE AND STAGE OF THE PROCEEDINGS

A Federal Grand Jury indicted the defendant on January 24, 2006, for the possession of a firearm by a felon. D.I. 1. On April 28, 2006, the defendant filed a Motion to Suppress. D.I. 18. The defendant's motion sought to suppress the evidence obtained from a warrantless search of 1208 Valley Stream Drive, Newark, Delaware on December 15, 2005, and the statements made by the defendant to the Delaware State Police during the search. The government filed a pre-hearing response on October 16, 2006. The Court held a hearing on the Motion to Suppress on October 18, 2006. The Court orally denied the defendant's Motion to the extent it sought to suppress statements taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966). The Court directed the parties to submit briefing on the issue of the validity of the search. The Court also asked that the parties address whether any failure on the part of the searching officers to comply with agency search policies and procedures required the Court to suppress the evidence discovered during the search.

## STATEMENT OF FACTS

In December, 2005, Rashan J. Baul was on Level 2 probation with the State of Delaware. Tr. at 5.[1] Level 2 Probation is a "general" probation; a probationer is required to report to his probation officer once a month. Id. A Level 2 probationer has no curfew. Id.

In December, 2005, James Kelly was a senior probation officer employed by the Delaware Department of Corrections, Bureau of Community Corrections, Probation and Parole

---

[1] All references are to the transcript of the October 18, 2006 suppression hearing..

("Probation"). Tr. at 2. Officer Kelly had been a probation officer for about eight years, and was assigned to a unit known as the Governor's Task Force ("GTF").[2] Tr. at 3-4. The GTF is a partnership between Probation and the Delaware State Police that focuses on probationers and parolees believed to be active in illegal behavior. Tr. at 4.

In connection with its operations, the GTF conducts searches of the residences of probationers. GTF personnel are required to obtain supervisory approval before conducting a search. Tr. at 6. Officer Kelly described the process for obtaining approvals as follows:

> 6:18    A.    Basically, when we have reasonable suspicion
> 19 that an illegal behavior may be occurring, we -- I go
> 20 over the facts of the case, make sure that they are still
> 21 active on probation. I check the criminal history, make
> 22 sure there is no active capiases or warrants at that
> 23 time, and I discuss the circumstances of the search to be
> 24 with my direct supervisor.

Id. Officer Kelly also testified that although he does not have access to a given probationer's file, he does have access to an automated system in his office that contains the probationer's case notes and status sheet. Tr. at 7. Officer Kelly typically checks the case notes and status sheet as part of his pre-search preparation. Id.

On December 12, 2005, Officer Kelly received some information about the defendant from his supervisor, Patrick Cronin. Tr. at 7, 23. Supervisor Cronin has been employed by probation for twenty years. Tr. at 67. This initial conversation between Supervisor Cronin and Officer Kelly was face to face. Tr. at 7, 68. Supervisor Cronin told Kelly that he (Cronin) had

---

[2]Officer Kelly was not the defendant's probation officer. Tr. at 6.

2

received information that a car registered to the defendant had been found by the Wilmington

Police Department with about 3.5 ounces of cocaine[3] in it. Tr. at 7, 8-9.

Officer Kelly testified that he and Supervisor Cronin sat down and discussed the case. Id.

at 8-9. As part of that process, Officer Kelly verified that the defendant was on active probation.

Id. at 8. Officer Kelly was able to ascertain that the defendant continued on probation at the time

of the search because he had previously been found to be in violation of probation imposed at an

earlier time. Tr. at 11-13; GX 1 at 1. Because he was on probation, the defendant was required

to sign a standard "Conditions of Supervision" form. GX 1; Tr. at 10. The form was executed

on March 26, 2004. GX 1. It listed a number of standard conditions, including a condition that

the defendant not commit a moving traffic offense (GX 1, condition no. 1) and that he report any

police contact to his probation officer within 72 hours of that contact. GX 1, condition no. 2. On

the second page, the form expressly stated:

> **YOU ARE SUBJECT TO ARREST AND TO A SEARCH OF YOUR**
> **LIVING QUARTERS, PERSON OR VEHICLE WITHOUT A WARRANT**
> **AT ANY TIME BY A PROBATION/PAROLE OFFICER.** I have read or
> have had read to me the above Conditions of Supervision. I consent to and fully
> understand their content and meaning.

GX 1 at 2. The defendant's signature appeared on both pages of the form. GX 1.

Officer Kelly testified that he checked "DELJIS"[4] for the defendant's criminal history and

to ascertain whether he had any active warrants or capiases. Officer Kelly recalled that the

defendant's criminal history showed theft charges, receiving stolen property charges, burglary

charges, and "numerous" violations of probation. Tr. at 17-18. Officer Kelly also checked the

---

[3]The substance was in fact a distribution quantity of "crack" cocaine. Tr. at 90.

[4]DELJIS is a database maintained by the state that contains criminal history information. Tr. at 17.

3

defendant's probation officer's[5] notes that were available to Kelly through an automated system. Tr. at 18. The notes revealed a number of probation violations documented by the defendant's probation officer; Officer Kelly recorded this information in his arrest-incident report. GX 2. The notes indicated that the defendant had committed six violations of his probation in a six-month period, for an average of one violation per month. GX 2; Tr. at 20-21. Specifically, the notes revealed that:

- On November 17, 2005, the defendant was cited for driving in excess of 55 m.p.h. by the Delaware State Police. The defendant failed to report this police contact to his probation officer within 72 hours as required.

- On November 10, 2005, the defendant was cited by the Wilmington Police Department for failure to have insurance identification in his possession, expiration of registration upon transfer of title, and operation of an unregistered motor vehicle.

- On September 2, 2005, the defendant was cited by the Wilmington Police Department for operation of an unregistered motor vehicle. The defendant failed to report this police contact to his probation officer within 72 hours as required.

- On August 7, 2005, the defendant was cited by the Wilmington Police Department for illegal operation of an off-highway vehicle.

- On July 19, 2005, the defendant was cited by the Greenwood Police Department for speeding in excess of limits based on conditions. The defendant failed to report this police contact to his probation officer within 72 hours as required.

---

[5]The defendant's assigned probation officer is Angela Latsko. Tr. at 6.

4

- On June 8, 2005, the defendant was cited by the Wilmington Police Department with driving while suspended or revoked. The defendant failed to report this police contact to his probation officer within 72 hours as required.

All of these violations were moving motor vehicle offenses, which were violations of the defendant's probation. Tr. at 21; GX 1, condition no. 1; GX 2. Importantly, in four out of the six violations listed (June 8, July 19, September 2, and November 17), the defendant had failed to report police contact to his probation officer as required. Tr. at 22; GX 2. Officer Kelly believed that, even without the information concerning the defendant's car and drugs, this violation history was sufficient reasonable suspicion to justify the search. Tr. at 43. Officer Kelly stated that it was reasonable to conclude that the defendant's pattern of not reporting violations meant that it was likely that further evidence of other violations would be found at the defendant's residence. Tr. at 28. In addition, based on the drugs found in the car registered to the defendant, the GTF was looking for drugs and drug paraphernalia in the defendant's residence. Id.

Probation policy required Officer Kelly to obtain approval from a supervisor before conducting a search. Tr. at 6. As discussed, Officer Kelly met with Supervisor Cronin on December 12, 2005, to discuss the information he had learned and to obtain the required approval. Tr. at 7-8, 24, 68. In connection with that approval process, Officer Kelly prepared an Arrest Search checklist, which he gave to Supervisor Cronin. Tr. at 26; GX 3. The purpose of the form, in Officer Kelly's words, is to "cover all of our bases and make sure that there was a sufficient reason to believe that the reasonable suspicion -- there was reasonable suspicion to conduct a search." Tr. at 26-27. Officer Kelly stated that the form documented that he had obtained the required approval. Tr. at 27.

Officer Kelly recalled that he prepared the body of GX 3 on December 12, and that he discussed GX 3 in person with Supervisor Cronin on that date. Tr. at 31. Although he filled out GX 3 on December 12, he did not date it until December 15, the date of the search, in accordance with his usual practice. Tr. at 31.

Officer Kelly testified that he attempted to conduct the search on the night of December 12, but did not do so because the defendant was not home on that night. Tr. at 24. Officer Kelly did not recall any further conversation with Supervisor Cronin, Tr. at 25; however, Supervisor Cronin testified that he spoke with Officer Kelly on December 13 and 14 about the defendant and he specifically re-authorized a search on December 14. Tr. at 69. Supervisor Cronin testified that he originally signed and dated GX 3 on December 12. Tr. at 72. Because he re-authorized the search on December 14, he later wrote a "4" over the "2" in the date to reflect that the final approval took place on December 14, 2005. Tr. at 72.

## ARGUMENT

## I. THE EVIDENCE OBTAINED IN THE SEARCH SHOULD NOT BE SUPPRESSED

### A.    Standard of Review

The search at issue took place without a warrant. Thus, the government must establish by a preponderance of the evidence that the search was reasonable. See United States v. Bowers, No. 04-133 KAJ, 2006 WL 1537378 at * 3 (D.Del. June 5, 2006) (citations omitted).

### B.    The Applicable Legal Standard Is "Reasonable Suspicion"

The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. Thus, "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" Griffin

6

v. Wisconsin, 483 U.S. 868, 873 (1987). "Reasonable" in this context means assessing on the one hand the degree to which a search intrudes on someone's privacy against, on the other hand, the degree to which the search promotes legitimate government interests. United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005). However, as Griffin noted, "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Griffin, 483 U.S. at 873-74. Probation, like incarceration, is a form of criminal sanction imposed by a court on an offender after a verdict, finding, or plea of guilty. United States v. Knights, 534 U.S. 112, 119 (2001). "It must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the average citizen to violate the law." Id. at 120 (internal citations and quotations omitted). The recidivism rate for probationers is "significantly higher than the general crime rate." Id. Moreover, and particularly relevant to this case, the Supreme Court has stated that "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." Id. (citation omitted).

   In sum, when a probationer or parolee is involved, the balance between privacy and government interest is affected. The probationer's reasonable expectation of privacy decreases, and the government's reasonable need to monitor behavior is increased. Williams, 417 F.3d at 376. In these cases, the standard is "reasonable suspicion." In order to assess whether there was

reasonable suspicion, the Court must determine whether, under the totality of the circumstances, the officer had a "particularized and objective basis for suspecting legal wrongdoing." Id.[6]

"Generally, for a suspicion to be reasonable, an officer must be able to articulate specific facts that support the suspicion and thus justify the intrusion." United States v. Grant, 256 F.Supp.2d 236, 245 (D.Del. 2003) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). "In evaluating whether a particular seizure or search was reasonable, 'it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?'" Grant, 256 F. Supp.2d at 245 (quoting Terry, 392 U.S. at 21-22).

### C.    Probation Had Reasonable Suspicion To Conduct The Search

The defendant was on probation with the State of Delaware at the time of the search. As a probationer, he had executed a Conditions of Supervision form where he acknowledged that his home was subject to search without a warrant at any time, and further that he was aware of this condition and understood it. Thus, under the exception to the Fourth Amendment's warrant requirement articulated in Griffin, Knights and Williams, the search was valid provided that the probation officers had reasonable suspicion that they would find contraband or evidence of probation violations at the defendant's residence.

The totality of the circumstances here provided Officer Kelly with reasonable suspicion, that is, a particularized and objective basis for suspecting legal wrongdoing. After Officer Kelly received information that a car registered to the defendant had been found to contain three and a

---

[6]The Third Circuit has rejected "stalking horse" claims as a viable theory to suppress evidence in this context. See Williams, 417 F.3d at 377-78. A "stalking horse" claim is one where a defendant contends that the probation search took place at the request of and in concert with law enforcement officers. Id. at 377. The Third Circuit held that applicable Supreme Court precedent made inquiries into the official purpose for the search "impermissible." Id. at 377-78.

half ounces of cocaine, he reviewed the defendant's history to see if a search was appropriate. Officer Kelly learned that first, the defendant had a history of "numerous" probation violations - in other words, he was and is one of the recidivists the Supreme Court described in <u>Knights</u> as part of its rationale for recognizing a decreased expectation of privacy for a probationer. Second, Officer Kelly's inspection of the defendant's probation file revealed that the defendant was engaged in a continuing recidivist pattern of new probation violations on an average of one per month for the six months preceding the search. Third, this pattern revealed that the defendant was regularly concealing probation violations by not reporting police contact to his probation officer as he was required to do. Again, this pattern is exactly in accord with the concern articulated by the Supreme Court in <u>Knights</u> – that probationers like the defendant have extra incentive to conceal their violations because they can be violated and incarcerated without benefit of the right to trial by jury and proof beyond a reasonable doubt afforded to an accused not yet in the criminal justice system. Finally, the information that a car titled in the defendant's name was found to contain illegal drugs of course impacted Officer Kelly's assessment of whether or not he had reasonable grounds to search. Viewed in totality, these facts articulated by Officer Kelly gave him a particularized and objective basis to reasonably suspect that the defendant was engaged in wrongdoing – specifically, an involvement with illegal drugs and the concealment of probation violations – and that further evidence of that wrongdoing – that is, further evidence of drug activity and further evidence of concealed probation violations – would be found at the defendant's residence.

**D.    Any Alleged Failure in Procedure Does Not Undermine The Validity of the Search**

As described above, the testimony at the hearing established that Officer Kelly had a face-to-face conference on December 12, 2005 with Supervisor Cronin at which they prepared the arrest-search checklist (GX 3). Tr. at 8, 71-72. Supervisor Cronin approved the search at that meeting and recorded his approval on GX 3 by writing "approved 12/12/05 2200." Tr. at 70-72. Because the defendant was not at home, however, the search was not conducted that night. Tr. at 24. Supervisor Cronin indicated that he gave a second – this time verbal – approval on December 14. Tr. at 69. The search took place shortly after midnight on December 15. GX 2. At some point, Supervisor Cronin changed the approval date on the form from December 12 to December 14 to document his renewed approval on December 14. Tr. at 72.

The arrest-search checklist (GX 3) indicates that approvals expire in 24 hours from the date and time of the supervisor's approval, unless an "optional" expiration is recorded by the supervisor. GX 3. In addition, Probation Policy 7.19, which is the policy that applied to the search in this instance, states that approvals expire in 24 hours unless the supervisor extends the expiration by writing in a new expiration date and time, and initialing.[7] Exhibit A at 4, ¶ 4.

At the October 18, 2006, hearing, the Court asked the parties to specifically address in briefing whether any purported failure by the GTF to conform with search policies and procedures would require the Court to suppress the evidence obtained in that search. The answer is no.

---

[7] Policy 7.19 was produced in discovery prior to the hearing. It was not introduced into evidence at the hearing by either party. It is attached hereto as Exhibit A because it is relevant to the question posed by the Court at the end of the hearing. The defendant has indicated through counsel that he has no objection to its inclusion in the record.

1.    **Delaware's Probation policies create no private right for the defendant.**

In United States v. Caceres, 440 U.S. 741 (1979), the Supreme Court addressed the question of whether it should exclude from evidence in a criminal case conversations recorded by Internal Revenue Service agents without Department of Justice approval in violation of federal regulations. In beginning its analysis, the Court noted that a court's duty to enforce an agency regulation is most evident when the regulation is mandated by the Constitution or federal law. Id. at 749. In applying this principle to the facts, the Court found that because one party (the IRS agent) consented to the conversations, neither the federal wiretap statute nor any other federal law required the agents to follow any particular procedures. Id. at 749-50. Second, the Court found that individuals do not have Constitutional protections against having their conversations recorded when they speak to law enforcement agents. Id. at 750. Thus, it followed that the Constitution did not require the IRS to adopt the regulations at issue. Id. at 751. Next, the failure of the IRS to get the required Department of Justice approval did not raise any equal protection issues because there was no evidence in the record to indicate that the Department of Justice would have denied the approval if IRS sought it. Id. at 752. Finally, the Court concluded that there was no due process issue raised, because there was no evidence in the record that Caceres reasonably relied on the regulations in determining how to conduct himself. Id. at 752-53. In sum, the Court held that the violation of the regulation did not require the exclusion of the evidence obtained in the recordings.

Caceres governs here. First, the Constitution only requires searches to be reasonable; it does not impose any particular bureaucratic framework that must be followed to assure that searches are reasonable. The Constitutional check on the reasonableness of searches is the

11

judiciary reviewing suppression motions, not any specific procedures that an agency might impose upon itself. Indeed, the Supreme Court has held that a state may even impose a "suspicionless" search regimen and still comply with the Constitutional reasonableness requirement. See Samson v. California, 126 S.Ct. 2193 (2006).

Second, no federal or state law required Supervisor Cronin and Officer Kelly to conduct a second face-to-face conference on December 14, 2005. No federal statute applies. The relevant Delaware state law is 11 Del.C. § 4321(d) which provides:

> (d) Probation and parole officers shall exercise the same powers as constables under the laws of this State and may conduct searches of individuals under probation and parole supervision *in accordance with Department procedures* while in the performance of the lawful duties of their employment and shall execute lawful orders, warrants and other process as directed to the officer by any court, judge or Board of Parole of this State; however, a probation and parole officer shall only have such power and duties if the officer participates in and/or meets the minimum requirements of such training and education deemed necessary by the Department and Board of Examiners.

(Emphasis added).

The Delaware Supreme Court has addressed a situation almost precisely like the one presented here. In Fuller v. Delaware, 844 A.2d 290 (Del. 2004), the defendant argued that a probation officer conducted a search in violation of correctional department procedures. Specifically, the defendant argued that the search at issue was invalid because the probation officer who conducted the search obtained verbal approval, but did not utilize a pre-search checklist nor conduct a face-to-face conference with the supervisor as required by correctional department regulations. Id. at 291. The Delaware Supreme Court rejected this argument, finding that the probation officer and the supervisor verbally discussed the information known to the probation officer and whether that information provided sufficient grounds for the search. Id. at 292. The Delaware Supreme Court went on to say "[t]he purpose of the regulations is to ensure

that the Department has sufficient grounds before undertaking a search. The individual procedures advance that goal but are not independently necessary . . . ." Id. The facts in Fuller closely parallel those here: Supervisor Cronin initially gave face-to-face approval on December 12 (which did not occur in Fuller), and then verbal approval on December 14 (as was the case in Fuller). Because the Delaware Supreme Court is the final authority on the interpretation of Delaware law, the search procedures in this case cannot have violated section 4321(d), even if Supervisor Cronin and Officer Kelly did not comply with Policy 7.19 when Supervisor Cronin gave verbal approval on December 14.

Similarly, the defendant can raise no equal protection argument based on the alleged failure to follow the regulations, because he cannot demonstrate that Supervisor Cronin would have denied the search if only he (Cronin) and Officer Kelly had a second face-to-face meeting on December 14 with a brand new checklist. See Caceres, 440 U.S. at 752. There is no basis to conclude he was treated differently any than similarly-situated persons. Finally, the defendant cannot raise a due process argument based on the alleged failure to follow the regulations because he has not demonstrated (and cannot demonstrate) that he relied on those regulations in determining how to conduct himself. Id. at 752-53. Thus, the exclusionary rule should not be applied here, even if the Court were to conclude that Officer Kelly was required to conduct a second face-to face meeting in order to obtain the necessary approval. Id. at 757.

### 2.    The Knights decision establishes that strict compliance with search policies is not required.

In Williams, the Third Circuit addressed a challenge to a probation search on the grounds that the search did not comply with Pennsylvania law. Williams, 417 F.3d at 378. The Court of Appeals rejected that argument. The Court of Appeals noted that while the "special needs"

13

exception articulated in <u>Griffin</u> requires that "special needs" searches be conducted pursuant to a state probation/parole search regimen that complies with the Fourth Amendment,[8] the Supreme Court in <u>Knights</u> offered a second and discrete path to justifying the search that does not depend on the requirements of the state probation/parole search regimen. Where a probationer has agreed to the "salient circumstance" of a search condition, <u>Knights</u>, 534 U.S. at 119, that path requires only the application of ordinary Fourth Amendment principles, which in both <u>Williams</u> and the instant case means the presence of reasonable suspicion at the time of the search. <u>Id</u>. As demonstrated above, Officer Kelly had reasonable suspicion, and the evidence obtained in the search should not be suppressed.

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny the Motion to Suppress.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: _Douglas E. McCann_
Douglas E. McCann
Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899
(302) 573-6277 x128

Dated:  October 30, 2006

---

[8]The Delaware regimen, which requires reasonable suspicion, plainly satisfies the Fourth Amendment, particularly in light of the regimens examined in <u>Griffin</u> (reasonable suspicion), <u>Knights</u> (reasonable suspicion) and <u>Samson</u> (no suspicion required).

14

## CERTIFICATE OF SERVICE

I, Douglas E. McCann, hereby certify that on October 30, 2006, I served the foregoing:

### GOVERNMENT'S POST-HEARING OPENING BRIEF
### ON DEFENDANT'S MOTION TO SUPPRESS

by CM/ECF on

> Eleni Kousoulis, Esquire
> First Federal Plaza
> 704 King Street, Suite 110
> Wilmington, Delaware  19801

Douglas E. McCann

United States v. Rashan Baul
Criminal No. 06-06-KAJ
      Government's Post-Hearing Opening
      Brief On Defendant's Motion To Suppress

# ATTACHMENT A

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 1 of 16 |
| BUREAU OF COMMUNITY CORRECTIONS PROBATION AND PAROLE | RELATED ACA STANDARD: 2-3159, 2-3160 DOC POLICY: BCC POLICY: DPP POLICY:  7.11, 7.21 | |
| SECTION: 7 - SUPERVISION ACTIVITIES | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |
| APPROVED BY DIRECTOR: | | EFFECTIVE DATE: 06/05/01 |

I.    AUTHORITY:        11 Del. Code, §1241, §1241, §1902, §4321, §4334(b) and §4352(a).

II.   PURPOSE:        To provide guidelines and procedures for using the Arrest-Search Checklist and in making arrests and searches.

III.  APPLICABILITY: All Probation and Parole Officers.

IV.   DEFINITIONS:

ARREST-SEARCH CHECKLIST (Form #506): A form used to facilitate a case conference between the Officer, who is seeking an arrest or search action and his immediate Supervisor. The form contains the following sections; Arrest Decision Factors, Arrest Strategy, Decision to Search, and Search Strategy.

ARREST: To deprive a person of his liberty by legal authority. Taking, under real or assumed authority, custody of another for the purpose of holding or detaining him to answer a criminal charge. Arrest involves the authority to arrest, the assertion of that authority with the intent to effect an arrest, and the restraint of the person to be arrested. All that is required for an ''arrest'' is some act by officer indicating his intention to detain or take person into custody and thereby subject that person to the actual control and will of the officer; no formal declaration of arrest is required.[1]

CONTRABAND: Any item that a offender may not have in their control or possession pursuant to the Court, the Board of Parole, state or federal law or the conditions of supervision (i.e. deadly weapon, illegal drugs), or evidence of violation of any law or regulation.

DETENTION: To temporarily deprive a person of their freedom to depart the area based on reasonable suspicion. Refer to 11 Del. Code, §1902.

EXIGENT CIRCUMSTANCES: An unexpected or urgent event which did not allow an opportunity for prior planning, and which requires immediate action to achieve a successful resolution. Exigent circumstances, that lead to arrests or searches without prior supervisory review must be clearly stated and documented in the incident report.

FRISK: Contact of the outer clothing of a person to detect by the sense of touch whether a concealed weapon is being carried. A frisk is less

| STATE OF DELAWARE DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS PROBATION AND PAROLE | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 2 of 16 |
|---|---|---|
| | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

than a full-scale search.

CONTACT WITH OFFENDER IN THE COMMUNITY:

A probation and parole officer only has statutory authority to administratively search active probation and parole offenders. Officers have peace officer authority over citizens. The following guidelines apply to contact with individuals in the community:

1. Probation and Parole Officers may detain any offender positively identified as such in order to determine the nature of their activity and whether or not they are complying with conditions of supervision.

2. Probation and Parole Officers may not detain any other individual abroad unless there are reasonable grounds to suspect that the person is committing, has committed or is about to commit a crime. If this reasonable suspicion exists, a peace officer may demand of the person their name, address, business abroad and destination. If that person is positively identified as under active probation or parole supervision, they are subject to administrative search or other actions in accordance with Department of Correction policy and procedures.

3. The Delaware Supreme Court has ruled that mere flight from a law enforcement officer is not a sufficient ground to detain an individual, absent reasonable suspicion already existing for a detention. Pursuit to enforce a detention may take place if:

   a. The subject fleeing is actively on probation or parole supervision, OR

   b. The subject fleeing is known to be the subject of an active warrant or capias, OR

   c. Reasonable suspicion exists that the person fleeing presents an immediate threat to the community.

4. When assisting police, at their request, in accordance with 11 Del. Code §1241, Refusing to aid a police officer and §1242, Limitation of civil liability for aiding a police officer you may render whatever assistance is necessary to effect an arrest, or prevent the commission of an offense.

SEARCH: An examination of a person's house or other buildings or premises, or of his person, or of his vehicle, etc. with a view to the discovery of contraband or illicit or stolen property, or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense with which he is charged.[1]

SEARCH INCIDENT TO ARREST: A probation officer who has the right to arrest a person either with or without a warrant may search his person and the immediate area of the arrest for weapons.[1]

| STATE OF DELAWARE DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS PROBATION AND PAROLE | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 3 of 16 |
|---|---|---|
| | TITLE:  ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

<u>SEARCH, LIVING QUARTERS AND PROPERTY</u>: A search of the offender's living quarters, which should be confined to the area actually occupied by the offender, and may include common areas such as kitchen, bathroom, living room, closets, curtilage and outbuildings to which the offender has common access, etc. and the offender's property, i.e. motor vehicle. Curtilage: Includes those outbuildings which are directly and intimately connected with the habitation and in proximity thereto and the land or grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic employment.[1]

<u>SEARCH, PERSONAL</u>: A search of a offender's person, including but not limited to, the offender's pockets, frisking the offender's body, examination of the offender's shoes and hat and an inspection of the offender's mouth. An Officer conducting the search must be of the same gender as the offender.

<u>SEARCH WARRANT</u>: An order in writing, issued by a justice or other magistrate, in the name of the state, directed to an officer, authorizing him to search for and seize any property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, or things otherwise criminally possessed; or, property designated or intended for use or which is or has been used as the means of committing a crime.[1] A search warrant may also be used to search for the body of the offender.

1. References Black's Law Dictionary, 6th Ed.,1998.


V.     PROCEDURE INDEX:

       A.   ARREST-SEARCH CHECKLIST
       B.   ARREST DECISION FACTORS
       C.   ARREST STRATEGIES
       D.   ARREST PROCEDURES
       E.   SEARCH DECISION FACTORS
       F.   SEARCH STATEGIES
       G.   SEARCH PROCEDURES.

VI.   PROCEDURES:

       A.   ARREST-SEARCH CHECKLIST.

            1.   The Arrest-Search Checklist form is to be used for all arrests and searches in the community; unless, exigent circumstances exist forcing the Officer into action. Use of exigent circumstances will be documented and scrutinized carefully by the agency. The officer must make every effort to contact his Supervisor, the Duty Supervisor, any other Supervisor, or any other supervisor in the chain-of-command prior to any actions

| STATE OF DELAWARE<br>DEPARTMENT OF CORRECTION<br>BUREAU OF COMMUNITY CORRECTIONS | PROCEDURE NUMBER:<br>7.19 | PAGE NUMBER:<br>4 of 16 |
|---|---|---|
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND<br>ARREST-SEARCH CHECKLIST | |

being taken.

NOTE: If the officer has time to plan the arrest and request the assistance of other officers, then the officer should have time to contact supervisory staff for approval.

2.  One half of the form is to be completed for planning arrest actions and the remaining half for planning searches. When planning an arrest, the form in this procedure will be referred to as a Arrest Checklist and when planning a search, the form will be referred to as a Search Checklist.

3.  To complete the form for approval, the offender's name and address must be filled-in, appropriate blocks checked in the *Arrest Decision Factors* and *Arrest Strategy* area for an arrest action and/or the *Decision to Search* and *Search Strategy* areas for searches, All members of the arrest and/or search team will be listed, the officer must sign and date, and the supervisor must approve the action by signing, dating, and entering the time of approval.

4.  The Arrest-search Checklist form expires 24 hours after the date and time the Supervisor signed the form; unless, the Supervisor extends the period by writing-in an expiration date, time, and initialing.

5.  ARREST CHECKLIST:

    a.  The officer and supervisor will hold a case conference using the Arrest Checklist as a guideline. During the case conference the supervisor will review the ''Yes'' or ''No'' responses of the officer to the following arrest decision factors:

        (1) Reason exists to believe offender is engaged or about to engage in a clear and substantial risk to the community or their self.
        (2) An active warrant or capias exists.
        (3) Offender has a capias history.
        (4) Offender likely to abscond.
        (5) Other factors justifying the arrest (list).

    b.  The supervisor will review the ''Yes'' or ''No'' responses of the officer to the following arrest strategies:

| STATE OF DELAWARE<br>DEPARTMENT OF CORRECTION<br>BUREAU OF COMMUNITY CORRECTIONS<br>PROBATION AND PAROLE | PROCEDURE NUMBER:<br>7.19 | PAGE NUMBER:<br>5 of 16 |
|---|---|---|
| | TITLE:  ARRESTS, SEARCHES AND<br>ARREST-SEARCH CHECKLIST | |

(1) Supervisor, Manager, or Director notified.
(2) Briefing held.
(3) Superior force present to make arrest.
(4) Personnel trained in arrest procedures, handcuffing techniques, and defensive tactics (If not, explain in the Arrest / Incident Report.
(5) Police contacted to make the arrest.

6. SEARCH CHECKLIST.

    a. The officer and supervisor will hold a case conference using the Search Checklist as a guideline. During the case conference the supervisor will review the ''Yes'' or ''No'' responses of the officer to the following search decision factors:

        (1) Sufficient reason to believe the offender possesses contraband.
        (2) Sufficient reason to believe the offender is in violation of probation/parole.
        (3) Information from a reliable informant, indicating offender possesses contraband or is violating the law.
        (4) Information from the informant is corroborated.
        (5) Approval obtained from Supervisor, Manager, or Director.

    b. The supervisor will review the ''Yes'' or ''No'' responses of the officer to the following search strategies:

        (1) Proper planning for search is completed.
        (2) Sufficient staff to search.
        (3) Individual responsibilities assigned.
        (4) Police called to provide search security.
        (5) Persons involved in search have been properly trained.
        (6) Arrangement made to secure contraband potentially seized.

7. NOTIFICATION OF THE MANAGER: Either the Probation and Parole Officer or the Supervisor may notify the Manager.

    a. The Manager will be notified on all arrests occurring after 5:00 p.m. and prior to 8:00 a.m. This notification includes other times the probation

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 6 of 16 |
| BUREAU OF COMMUNITY CORRECTIONS | | |
| PROBATION AND PAROLE | TITLE:   ARRESTS, SEARCHES AND | |
| | ARREST-SEARCH CHECKLIST | |

office is closed; such as, on the weekends and holidays.

b.  The Manager will be notified when a search warrant is to be executed in conjunction with the arrest. A copy of the search warrant will be made available for the manager's review before the search warrant is submitted to the Court for approval.

c.  The Manager will be notified of all Administrative Warrant arrests immediately, but no later than one hour after the offender was apprehended. The Operation Safe Streets (OSS) Unit is an exception to this requirement.

d.  The Manager will be notified on any injuries or any damage to property immediately, but no later than one hour after the injury or damage occurred.

8.  POST ARREST AND/OR SEARCH REQUIREMENTS.

a.  No later than one (1) duty day following the arrest and/or search; the officer will complete an Arrest/Incident Report and attach the completed Arrest-search Checklist.

b.  Any event involving the use of force, injury, or lost, damaged or stolen property will be reported on the Arrest / Incident Report before the end of the employee's shift that day. All employees involved in or witness to an incident will also be required to complete an Arrest / Incident report before the end of their shift that day.

c.  The Checklist and the Arrest/Incident Report will be completed in triplicate (one for the Manager, one for the Supervisor and one for the offender's case file).

d.  The Supervisor will review, comment if necessary, and forward the report to the Manager.

9.  The Manager will begin the agency review process and will forward all copies of the Arrest/Incident reports and the Checklist to the appropriate person(s) for their review.

B.  ARREST DECISION FACTORS.
Absent exigent circumstances, the decision to arrest an

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS | 7.19 | 7 of 16 |
| PROBATION AND PAROLE | TITLE:   ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

offender should only be made after discussing the matter with your supervisor, or in their absence, another unit supervisor or follow the chain of command. The Arrest Checklist will be used in the decision making process for all community arrests. Generally, the following factors should be considered when deciding whether to arrest an offender:

1. The Officer has knowledge, or reason to believe that an offender is engaged, or about to engage in conduct, which presents a clear risk to the community, self or others.

2. There is an existing warrant or capias for a violation of supervision or for traffic or criminal offenses. The warrant or capias must be verified with the agency of issue.

3. The offender is known to have a significant capias history, which has resulted from failures to appear in court.

4. There is evidence that the offender has deliberately absconded or is about to abscond from supervision. The fact that the offender has only missed scheduled office visits is insufficient evidence in itself; there are other factors that should be considered in making this decision.

5. The Division of probation and parole recognizes every arrest situation cannot be defined. Officers faced with an exigent circumstance, a sudden unexpected or urgent situation must use sound judgment, common sense, experience, and apply training techniques in dealing with these situations.

C.   ARREST STRATEGIES.

1. Prior to approving any arrest a Supervisor, Manager, or the Director must review the arrest decision factors.

2. A briefing will be held with staff involved in the arrest to cover the following minimum information:

   a. Identify the subject of the arrest, display a photo if possible, mention any dangerous aspects of the offender, and any criminal history that could affect the officers' actions or safety.

   b. Identify the location of the arrest, description of the exits, obstructions, and if the offender is likely to have visitors at the time of the arrest.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS | 7.19 | 8 of 16 |
| PROBATION AND PAROLE | TITLE:   ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

    c. Verify that all arrest team members know each other by sight, verify radio identification signs, and test communications and all equipment before the arrest.

    d. Identify assignments at the arrest scene for front door, back door, and transportation of the offender.

    e. After the arrest, a debriefing is helpful for parties in future actions.

3. Assure that superior force is present for the arrest. It is safer to have more officers than too few.

4. Make sure all arrest team members are trained in arrest procedures, handcuffing techniques, and defensive tactics. Exceptions to this must be justified in the Arrest/Incident Report.

5. Contact the appropriate police communication center and advise them of the location of the planned arrest. Request uniformed assistance if available. The officer's uniform is an instant sign of authority to the offender and provides a margin of safety for the other arrest team members.

D. ARREST PROCEDURES.

1. OFFICER SAFETY IS THE FIRST CONSIDERATION for arrests in the office or in the community.

    a. Officers must have successfully completed training in arrest procedures.

    b. Officers will not deliberately or unnecessarily place themselves in situations that they cannot safely manage.

    c. Superior force must be present to demonstrate to the offender that they have no chance to successfully resist or escape. A presence of 2 officers to 1 offender will in most cases create this impression and is the minimum number of officers required to make a planned arrest. The number of officers to an offender will increase depending on the history, mental, and emotional state of the offender.

    d. If two officers or more are involved in an arrest, at least one of those officers must have completed their

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF COMMUNITY CORRECTIONS | 7.19 | 9 of 16 |
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND<br>ARREST-SEARCH CHECKLIST | |

probationary period.

2. Verify the warrant or capias is still outstanding before making the arrest. A copy will be provided to the police officer.

3. Notify your immediate Supervisor, or in his absence follow the chain of command, to review the Arrest Checklist. Upon approval, notify the police.

4. All field contacts with offenders are in accordance with the definition titled, CONTACT WITH OFFENDER IN THE COMMUNITY.

5. **IN-OFFICE ARREST:**
Plan the in-office arrest without relying on police assistance or the assistance to arrive in a timely manner.

   a. Obtain supervisor approval prior to arrest.

   b. Select an arrest team consisting of a minimum of 2 officers, one of which must have completed their probationary period.

   c. Escort the offender to an isolated area; such as, your office. You want to arrest the offender away from the general public, other offenders, and relatives of the offender that may interfere with the arrest and may create a dangerous situation.

   d. Inform the offender he is under arrest, handcuff the offender, and search the offender for weapons. Seize all weapons (including a legal pocketknife) as evidence. Weapons will not be accepted at the prison with the offender's other property.

   e. Place the offender in the temporary holding cell, if available, and post an officer to guard the prisoner. If the holding cell is not available and the prisoner is handcuffed, then a minimum of one officer will need to stay with the offender in an isolated area.

   f. If police are not responding, then transport the offender to the prison or court in accordance with the procedure for transporting prisoners.

6. In approved circumstances or an emergency, which has previously been defined as a sudden, unexpected urgent situation, Officer's may arrest an offender without a

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 10 of 16 |
| BUREAU OF COMMUNITY CORRECTIONS | | |
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

previously issued warrant or capias. In these cases, the Administrative Warrant form should be used for the violation of probation or parole.

7. If the arrest was made using an Administrative Warrant, the Officer must notify the Court or the Board of Parole as soon as possible and submit a report to the appropriate jurisdiction with a copy of the Administrative Warrant.

8. Once an arrest has been completed, the Officer of record is responsible for completing an Arrest / Incident Report. A copy of the Arrest-search Checklist and a copy of the capias or warrant will be submitted with the Arrest/Incident Report.

9. A search of the offender will be made immediately after the offender has been restrained. The search will be conducted by an officer of the same gender.

10. Arrests in the community should be made with the assistance of law enforcement officers, if available. In situations when police officers cannot be contacted prior to making an arrest, the DECIDING FACTORS should be:

   a. The offender's threat to the community.

   b. Officer safety.

11. Officers will not engage in any vehicle pursuits with another vehicle. If an offender succeeds in escaping, contact the police, and provide them as much information as possible regarding a description of the offender, his method of transportation, etc.

12. The Division recognizes that pursuing individuals on foot may be necessary at times. Before engaging in a foot pursuit officers should apply good judgment, common sense, and rely on training, as foot pursuits present a greater risk to the officer's safety. Absent exigent circumstances, no less than two officers will be involved in a foot pursuit or one officer with a police officer. Officers should consider the following factors when engaging in a foot pursuit:

   a. The foot pursuit is in accordance with the definition titled, CONTACT WITH OFFENDER IN THE COMMUNITY.

   b. Officers may not engage in a foot pursuit; unless, they are properly identified as a probation officer.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 11 of 16 |
| BUREAU OF COMMUNITY CORRECTIONS | | |
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

Proper identification includes a clearly marked shirt, jacket, or badge. Officers should also make a verbal identification of themselves where appropriate during the chase. Your instant identification is a safety issue; especially, in cases where a police officer, who is responding to the pursuit, or a citizen in the area would not be able to distinguish you from the offender.

c.  Consider the risk of the area in which the pursuit takes place and your distance from your vehicle.

d.  During the foot pursuit, the officers should consider remaining within communication of each other in order that superior force is present at the moment of apprehension.

e.  Officers should consider communication difficulties and the potential lack of back-up available to them. If manpower is present, one officer should remain with the vehicle in order to track the chasing officers and expedite their recovery and the removal of the offender from the area.

f.  Officers are prone to injury during chases; especially chases in the evening hours when obstacles, clothing lines, and other debris may trip the officer.

g.  If an officer becomes injured during the chase; another officer will cease chasing immediately in order to protect and render aid to the officer.

13. Transportation of offenders without police assistance is the responsibility of the arresting Officers.

14. Where to transport the prisoner.

a.  For all Administrative Warrant arrests for probationers will be taken to the court having jurisdiction over the offender. If the court is closed, the prisoner will be taken to the appropriate prison facility.

b.  For all Administrative Warrant arrests for parolees will be taken directly to the appropriate prison facility. There is no right to bail for parole violators. Keep in mind that in all parole cases stemming from a technical violation will require a Preliminary Hearing be held within 10 days.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF COMMUNITY CORRECTIONS | 7.19 | 12 of 16 |
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND<br>ARREST-SEARCH CHECKLIST | |

     c. For other warrant or capias arrests, not involving an Administrative Warrant, the probationer or parolee will be taken to the police agency issuing the warrant or the highest court of jurisdiction issuing the capias. If the court is closed, the offender will be taken for arraignment to the nearest open J.P. Court.

     d. For all Rule 9 Warrants (also known as True Bills or Indictments), the prisoner will be taken to the investigating police agency or if the police agency cannot be identified, to Superior court if open or to the nearest open J.P. Court.

E. SEARCH DECISION FACTORS.
Absent exigent circumstances, the decision to search an offender or his living quarters should only be made after discussing the matter with your supervisor, or in their absence, another unit supervisor or follow the chain of command. The Search Checklist will be used in the decision-making process for all planned searches. Generally, the following factors should be considered when deciding whether to search.

1. The Officer has knowledge or sufficient reason to believe the offender possesses contraband.

2. The Officer has knowledge or sufficient reason to believe the offender is in violation of probation or parole.

3. There is information from a reliable informant indicating the offender possesses contraband or is violating the law. The following are things to consider when evaluating information received:

     a. Was the offender observed by another officer, does an officer have past experience with the offender, or a similar type circumstance.

     b. In evaluating reliability of information, was the information detailed, consistent, was the informant reliable in the past, and consider the reason why the informant is supplying information.

     c. The offender's activity indicates he may possess contraband, which may be supportive of the informant's information.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION<br>BUREAU OF COMMUNITY CORRECTIONS | 7.19 | 13 of 16 |
| PROBATION AND PAROLE | TITLE:    ARRESTS, SEARCHES AND<br>ARREST-SEARCH CHECKLIST | |

    d. Prior seizures of contraband from an offender, prior Violation of Probation, and conviction pattern.

4. The information from the informant is corroborated.

5. Approval for the search has been obtained from a Supervisor, a Manager, or the Director. If approval was not obtained prior to the search, list the exigent circumstances on the Search Checklist requiring you to proceed with the search.

F. SEARCH STRATEGY.
Prior to any search, a substantial amount of planning, preparation, and testing of equipment is required for officer safety.

1. Is there sufficient staff to do the search. The amount of staff required will vary with the location of the place to be searched, the number of exits, the size of the building or area, and the number of occupants inside.

2. Assign officers to individual responsibilities. As an example, consider the following assignments to be covered in a large search operation and that some officers will have multiple assignments:

    a. A team leader with no task assignment and a relief person to fill-in for positions vacated for various reasons including injury.

    b. Front door, back door, windows on the side of the building, and perimeter security.

    c. A communications officer during the search.

    d. Officers assigned to search the residence and a recorder to log names of persons in the house and to record any evidence discovered. These assignments must be Probation and Parole Officers.

    e. Security of the scene and of any residents and/or prisoners inside the building.

    f. Transportation officers.

    g. Consider extra officers in the area for backup for emergencies that may arise.

3. Keep in mind that an administrative search is an authority

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| DEPARTMENT OF CORRECTION | 7.19 | 14 of 16 |
| BUREAU OF COMMUNITY CORRECTIONS | | |
| PROBATION AND PAROLE | TITLE:   ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

assigned to Probation and Parole Officers and only Probation and Parole Officers may search the scene. If the police get involved in the actual searching; the court has viewed this as probation and parole collaborating with the police and have thrown the evidence out of court. Police may handle security, communications, and transportation roles.

4. Proper planning for the search is completed.

5. Persons involved in the search have been properly trained.

6. Arrangements made to secure contraband potentially seized.

G. SEARCH PROCEDURES.

1. THERE ARE TWO TYPES OF SEARCHES:

   a. Search Warrants may be obtained and executed according to the provisions of 11 Del. Code, Chapter 23. Search warrants are very detailed and will not be covered in this procedure.

   b. Administrative searches may be a personal search physically of the probationer or parolee and/or a search of the offender's living quarters, common areas, surrounding property, and automobile(s).

2. All planned searches require the completion of a Search Checklist and if appropriate an Arrest Checklist and the approval of a supervisor or in his absence another Supervisor, a Manager, or the Director.

3. COMMON ELEMENTS FOR ALL ADMINISTRATIVE SEARCHES:

   a. Officers will strive to preserve the dignity of offenders.

   b. A probation and parole officer will be present of the same gender as the offender.

   c. If any items of the offender or other property are damaged pursuant to a search, the owner may file a complaint with the Director.

   d. The offender will be provided a written Property Receipt for all items seized during the search (see *Evidence or Seized Property* procedure 7.25).

| STATE OF DELAWARE DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS PROBATION AND PAROLE | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 15 of 16 |
|---|---|---|
| | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

    e. After the search, an Arrest / Incident Report will be completed within one duty day. The report should include as a minimum the facts leading up to the search, justification for the search, items recovered, damage to property, force used, injuries, and any new charges. If force was used, damage to property, or there were injuries involved, a report will be completed immediately prior to the end of the officer's shift that day. All other officers will also be required to submit a report immediately listing what they witnessed.

4.  PERSONAL SEARCHES.

    a. Probation and Parole Officers are not permitted to conduct strip searches or body cavity searches.

    b. Personal searches will be conducted when an offender is taken into custody. Personal searches will be conducted by members of the same gender. When this is not possible due to exigent circumstances, a frisk for weapons is permitted for officer safety.

    c. Two officers must be present for personal searches; unless, exigent circumstances exist for officer safety.

5.  SEARCHES OF LIVING QUARTERS AND PROPERTY.

    a. The assistance of a uniformed law enforcement officer(s) is recommended for officer safety.

    b. Uniformed officers are to provide security and should not assist in the search.

    c. The offender may be present for the search, except when safety or custody considerations, lack of availability, or other extenuating circumstances inhibit this.

    d. During the search, officers shall disturb the effects as little as possible.

    e. Care should be taken to prevent infringing the rights of other occupants of the residence.

| STATE OF DELAWARE DEPARTMENT OF CORRECTION BUREAU OF COMMUNITY CORRECTIONS PROBATION AND PAROLE | PROCEDURE NUMBER: 7.19 | PAGE NUMBER: 16 of 16 |
|---|---|---|
| | TITLE:    ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST | |

Delete Procedure 7.13, Arrest Checklist
Delete Procedure 7.14, Arrests
Delete Procedure 7.18, Search Checklist
Revise Procedure 7.19, Searches. New title is: *ARRESTS, SEARCHES AND ARREST-SEARCH CHECKLIST*. Effective: 06/05/01

000119