## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Criminal Action No. 06-06-KAJ |
| | : | |
| RASHAN BAUL, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S REPLY TO GOVERNMENT'S POST-HEARING OPENING BRIEF ON DEFENDANT'S MOTION TO SUPPRESS

Eleni Kousoulis, Esquire
Acting Federal Public Defender
704 King Street, Suite 110
Wilmington, DE 19801

DATED:  November 13, 2006

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Counterstatement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     I.     The Evidence seized in this case should be suppressed because there was no
reasonable suspicion to justify an administrative search of Mr. Baul's residence. . 5

          A.     The <u>Franks</u> violation in the present case undermines the validity of the
search of Mr. Baul's residence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

               1.     If Supervisor Cronin neglected to mention to Officer Kelly that Mr.
Baul had sold the Lumina, he made a material omission under
<u>Franks</u> and its progeny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               2.     When factoring in the information omitted by Supervisor Cronin, it
is clear that Probation and Parole lacked reasonable suspicion to
justify the search of Mr. Baul's home. . . . . . . . . . . . . . . . . . . . . . 12

               3.     The good-faith exception is inapplicable in this case . . . . . . . . . . 13

     II.     By failing to adhere to the Delaware Department of Corrections' procedure for
administrative searches of probationers' homes, the Governor's Task Force
violated Mr. Baul's Fourth Amendment right to be free from unreasonable
searches and seizures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Certificate of Service

# TABLE OF AUTHORITIES

## CASES

Carroll v. U.S., 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 16-17

Fuller v. State, 844 A.2d 290 (Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

Griffin v. Wisconsin, 483 U.S. 868 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 11, 18, 20

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Johnson v. U.S., 333 U.S. 10 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

Knowles v. Iowa, 525 U.S. 113 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kyllo v. U.S., 533 U.S. 27 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Lo-Ji Sales , Inc v. New York, 442 U.S. 319 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

New York v. Belton, 453 U.S. 454 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

Samson v. California, 126 S. Ct. 2193 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

Sherwood v. Mulvihill, 113 F.3d 396 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Silverman v. U.S., 365 U.S. 505 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Spinelli v. U.S., 393 U.S. 410 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

State v. Harris, 734 A.2d 629 (Del. Super. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

Terry v. Ohio, 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. v. Baker, 221 F.3d 438 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11, 12

U.S. v. Caceres, 440 U.S. 741 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

i

U.S. v. Calisto, 838 F.2d 711 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16

U.S. v. Chadwick, 433 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. v. Crawford, 372 F.3d 1048, 1077 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. v. Frost, 999 F.2d 737 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. v. Hill, 967 F.2d 902 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. v. Jacobs, 986 F.2d 1231 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. v. Knights, 534 U.S. 112 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22, 24

U.S. v. Leon, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 15-17

U.S. v. Peltier, 422 U.S. 531 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. v. Ross, 456 U.S. 798 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

U.S. v. Shields, 458 F.3d 269 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. v. Williams, 417 F.3 373, 378 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

## STATUTES AND OTHER AUHTORITIES

Administrative Procedure Act ("APA"), 4 U.S.C. §§ 551 et seq. at 701 et seq . . . . . . . . . . . . . 21

Cal. Penal Code Ann. § 3067(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

State of Delaware Department of Correction, Procedure Number 7.19   .  5, 17, 18, 19, 20, 21, 22

## COUNTERSTATEMENT OF FACTS

On December 8, 2005, Detective Thomas Looney of the Wilmington Police Department received information from a confidential informant that an individual named Demetrius Brown had been selling cocaine in the 2200 block of North Pine Street in Wilmington, Delaware.  Tr. at 80-81.[1] The informant told Detective Looney that Brown was driving a silver Chevrolet Lumina bearing a temporary registration.  Tr. at 81.  In his investigation of the tip, Detective Looney observed Brown driving a silver Lumina on December 8, and on December 9, he saw Brown standing at the driver's side door of the car.  Tr. at 81.  When Detective Looney approached the car on December 9, Brown ran away.  Tr. at 81-82.  Detective Looney then discovered cocaine in the car.  Tr. at 82.  When Detective Looney ran a check on the car, he discovered that it had been temporarily registered to Rahsan Baul.  Tr. at 86.  Detective Looney testified that he had the car under surveillance for several days, and that at no time did he ever see Rashan Baul anywhere near the car.  Tr. at 82.

When Detective Looney discovered that the car was registered to Rashan Baul,  he contacted the Governor's Task Force to ask how he could find Mr. Baul, because he knew that Mr. Baul was on probation at the time.  Tr. at 85-86.  He wanted to find out to whom Mr. Baul had sold the car.  Tr. at 87.  He spoke to members of the Governor's Task Force at some point between December 12 and December 14.[2]  Tr. at 85.  Although Detective Looney could not remember with certainty to whom he spoke at the Governor's Task Force, he testified that he believed it was Probation Officer

---

[1]Citations to "Tr." refer to the transcript of the hearing that this Court held on Mr. Baul's motion to suppress on October 18, 2006.

[2]The Probation and Parole records entered into evidence at the hearing did not consistently identify the date on which Detective Looney requested information regarding Mr. Baul.

James Kelly, Delaware State Trooper Popp, or Supervising Probation Officer Craig Watson.  Tr. at 85-86.  Detective Looney testified that when he contacted the Governor's Task Force, he explained that drugs had been found in a car registered to Mr. Baul, that Mr. Baul had sold the car, and that he wanted to speak with Mr. Baul to find out to whom he had sold the car.  Tr. at 82-83, 85-87.  Detective Looney specifically testified that he did not contact the Governor's Task Force to report that he believed Mr. Baul had any connection with the drugs found in the Lumina.  Tr. at 87.

On December 14, after receiving Mr. Baul's contact information from Probation and Parole, Detective Looney went to Baul's Towing, Mr. Baul's place of business, to ask him about the car.  As Detective Looney testified, he believed that Mr. Baul had sold the car to Demetrius Brown.  Tr. at 82-83.  Mr. Baul advised that he had in fact sold the car to Demetrius Brown, and he identified Brown in two photo lineups that the police prepared and presented to him.  Tr. at 83-84.  At no time, either during the discussion or afterwards, did the police arrest Mr. Baul in connection with the drugs in the Lumina.  Tr. at 84.

In the meantime, Supervising Probation and Parole Officer Patrick Cronin received the information that Detective Looney had provided in connection with the Lumina.  Rather than contacting Angela Latsko, the probation officer assigned to supervise Mr. Baul, Supervisor Cronin called Probation Officer James Kelly, a member of the Governor's Task Force, to ask him to follow up on the information that Detective Looney provided.  Tr. at 7.

At this point, Supervisor Cronin's and Officer Kelly's versions of the facts, to which each testified at the hearing, differ substantially.  Officer Kelly testified that Supervisor Cronin said that he had received information from the Wilmington Police Department that they had found drugs in an unoccupied vehicle registered to Mr. Baul.  Tr. at 8-9, 23.  According to Kelly's testimony,

2

Supervisor Cronin did not mention to him the fact that Detective Looney had seen Demetrius Brown in possession of the car, that the police believed Mr. Baul had sold the car to Brown, or that Looney's purpose in contacting the Governor's Task Force was simply to ask how to contact Mr. Baul for information about the car. Tr. at 38. In fact, Kelly testified that Supervisor Cronin never mentioned Mr. Brown at all, prior to the search. <u>Id.</u>

In addition, Officer Kelly testified that his conversation with Supervisor Cronin took place on December 12, 2005. Tr. at 24. He stated that he and Supervisor Cronin also reviewed Mr. Baul's probation record and noted six technical violations, all traffic citations, four of which Mr. Baul had not reported to his probation officer. Tr. at 21-22. They prepared an administrative search checklist for the search of Mr. Baul's home that evening, and Officer Cronin approved it by signing and dating it. Tr. at 24. As Officer Kelly testified, the purpose of the search checklist is "to cover all of our bases and make sure that there is a sufficient reason to believe that the reasonable suspicion – there is reasonable suspicion to conduct a search." Tr. at 26-27. Officer Kelly, other probation officers, and several police officers went to Mr. Baul's home that evening to conduct a search, but there was no answer at the door. Tr. at 24. According to Officer Kelly's testimony, he sent an email to Supervisor Cronin to advise him of this, but he did not recall any further conversations with Cronin between December 12 and 15. Tr. at 25.

As officer Kelly testified, the officers attempted the search again on December 15, 2005. Tr. at 33. Because Mr. Baul was at home, they were able to conduct the search, and they discovered a gun in one of the bedrooms. Tr at 33-34. Mr. Baul was arrested and charged as a felon in possession of a firearm. As Officer Kelly noted during his testimony, after the search had been completed, Supervisor Cronin modified the date on the administrative search checklist to reflect that he gave his

permission for the officers to attempt the search again.  Tr. at 41.  Although he does not recall with certainty whether he did so in Mr. Baul's case, Officer Kelly testified that when he conducts a search, he retains the original checklist until after the search has been completed.  Tr. at 41-42.  At the suppression hearing, Officer Kelly said that he did not remember giving the checklist back to Supervisor Cronin between the December 12 and 15.  Tr. at 42.  He did acknowledge, however, that the checklist provides for a 24-hour window in which Probation and Parole may conduct an administrative search, and noted that if he did not speak to Supervisor Cronin again between December 12  and 15, the authorization would have expired.  Tr. at 39.

Supervisor Cronin, on the other hand, testified that he was told that the police had seen Demetrius Brown in the Lumina and that Brown had fled from the vehicle upon the police officers' approach.  Contrary to Officer Kelly's testimony, Supervisor Cronin testified that he told Officer Kelly that Demetrius Brown was seen with the Lumina prior to the police discovery of the drugs inside.  Tr. at 77-78.  He also said that he told Officer Kelly that the police wanted to speak to Mr. Baul.  Tr. at 78.  In addition, he testified that he spoke to Officer Kelly on both December 13 and 14, and that between 8 and 10 p.m. on December 14, 2005, he asked him to attempt to search Mr. Baul's home again.  Tr. at 79.  Supervisor Cronin also admitted that he did not change the date on the administrative search checklist acknowledging his approval of the search until after the search had been completed.  Id.

## ARGUMENT

**I.    The Evidence Seized in This Case Should be Suppressed Because There Was No Reasonable Suspicion to Justify an Administrative Search of Mr. Baul's Residence.**

As the government acknowledges in its opening brief, <u>see</u> Government's Post-Hearing Op. Br. (hereinafter Gov't) at 6-8, this Court must determine whether Probation and Parole – or, more specifically, Officers Kelly and Cronin – based the decision to perform an administrative search of Mr. Baul's residence on reasonable suspicion.  In <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987), the Supreme Court approved the search of a probationer's home because the probation officers who conducted the search complied with a state regulation that permitted them to search a probationer's home on the basis of "reasonable grounds" to believe that he possessed contraband.  Although the special needs of a state probation system justify "a degree of impingement upon privacy" greater than that which the Constitution would permit with respect to the general public, <u>id.</u> at 875, the Fourth Amendment reasonableness requirement survives the "special needs" exception to the warrant requirement in the context of a state probation system.  <u>See id.</u> at 873.  The <u>Griffin</u> Court determined that the search in that case "satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfie[d] the Fourth Amendment's reasonableness requirements under well-established principles."  <u>Id.</u>

In <u>U.S. v. Knights</u>, 534 U.S. 112, 121 (2001), the Supreme Court more clearly stated that the Constitution requires reasonable suspicion of criminal activity before probation officers may search a probationer's home without a search warrant, regardless of whether the applicable state regulation specifically requires it.[3]  Furthermore, in order to conduct a warrantless search of a probationer or

---

[3]In addition, the Delaware Superior Court has indicated that Procedure 7.19, a regulation promulgated by the Delaware Department of Corrections that governs Delaware Probation and

parolee on the basis of a violation, there must be reasonable suspicion that further evidence of the violation will be found in the place to be searched.  See U.S. v. Baker, 221 F.3d 438 (3d Cir. 2000) (finding that defendant's violation of his parole by driving a vehicle without a license cannot give rise to a reasonable suspicion that he was committing other, unspecified, unrelated parole violations, to justify a search of his trunk).

Contrary to the government's assertions, Mr. Baul maintains that Probation and Parole lacked reasonable suspicion to support their search of his home on December 15, 2005.  Under Terry v. Ohio, 392 U.S. 1 (1968), in order to demonstrate reasonable suspicion that justifies a warrantless search, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  See Terry, 392 U.S. at 21. The judge who assesses the reasonableness of the search then determines whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]"  Id. at 21-22.  The Terry Court emphasized that this is an objective standard; the subjective good faith of the officer has no bearing on the analysis.  Based on the information known to various probation officers before the search, Probation and Parole did not have reasonable suspicion to search Mr. Baul's home in the present case, in that there was no reasonable suspicion to believe that evidence of a probation violation would be found therein.

---

Parole, requires that probation officers identify reasonable grounds to believe that a probationer is violating the conditions of his supervision in order to search his residence.  See State v. Harris, 734 A.2d 629, 634 (Del. Super. 1998).  Procedure 7.19, which the government appended to its opening brief, itself suggests that reasonable suspicion is required by listing a series of factors which a probation officer and his supervisor must consider, in the absence of exigent circumstances, before searching a probationer's home.  See Govt.'s Br. Attachment A, p. 12.

A.    The <u>Franks</u> violation in the present case undermines the validity of the search of Mr. Baul's residence.

In <u>Franks v. Delaware</u>, 438 U.S. 154, 165 (1978), the Supreme Court set forth a two-part test that the federal courts use to determine whether a magistrate's ability to make a probable cause determination has been compromised by law enforcement officers' intentional or reckless false statements in a search warrant affidavit. Under <u>Franks</u>, the Court must determine (1) whether the officers made the alleged misstatements intentionally or in reckless disregard for the truth, and (2) if so, whether the misstatements were material to the finding of probable cause. <u>Id.</u> at 171-172. As the Third Circuit explained in <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997) (citing <u>Franks</u>, 438 U.S. at 156), a falsehood is material when the court excises it from the affidavit and concludes that, without the false information, the affidavit is insufficient to establish probable cause.

Although the <u>Franks</u> Court only addressed material falsehoods in its opinion, the Third Circuit "ha[s] applied the <u>Franks</u> test to situations where affiants have omitted information from the affidavit." <u>U.S. v. Frost</u>, 999 F.2d 737 (3d Cir. 1993) (citing <u>U.S. v. Calisto</u>, 838 F.2d 711, 714-716 (3d Cir. 1998)). In <u>Sherwood</u>, the court explained how to conduct a <u>Franks</u> inquiry when the "alleged falsehood is a . . . material omission." <u>See</u> <u>Sherwood</u>, 113 F.3d at 399. When faced with an affidavit from which the affiant omitted information, the court must supply the omitted information to the original affidavit in order to determine whether the corrected affidavit supports a finding of probable cause. <u>Id.</u> at 400 (citing <u>Frost</u>, 999 F.2d at 742-743; <u>Calisto</u>, 838 F.2d at 714-716).

By its terms, in both <u>Franks</u> and the Third Circuit precedent on which Mr. Baul relies, the <u>Franks</u> test and its remedy apply to cases in which it is alleged that police officers injected falsehoods into an affidavit offered in an application for a search warrant or omitted information from the

7

affidavit.  However, Mr. Baul advances that the same logic should apply in the context of an administrative search because, according to the Supreme Court, "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" See Griffin, 483 U.S. at 873.

Specifically, Mr. Baul argues that in his case, if Supervisor Cronin failed to inform Officer Kelly that the police knew that Mr. Baul no longer owned the Lumina and that Demetrius Brown had been seen in possession of the car right before the drugs were discovered in it, that these were material omissions on the part of Supervisor Cronin.  Under the Franks framework, the Court would look at the body of information on which Probation and Parole relied in conducting the search – the discovery of drugs in the car registered to Mr. Baul and the six technical violations for motor vehicle offenses – and add to it the facts that Supervisor Cronin had omitted, i.e. that the car had been sold to Demetrius Brown, that Mr. Baul was no longer the owner of the car, and that Brown fled from the car just before the police discovered the drugs inside of it.  The Court would then determine whether, with that information in mind, Probation and Parole could successfully argue that its officers had reasonable suspicion to justify a search of Mr. Baul's residence.  Mr. Baul submits that it could not.

> 1.    **If Supervisor Cronin neglected to mention to Officer Kelly that Mr. Baul had sold the Lumina, he made a material omission under Franks and its progeny.**

In Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000), the Third Circuit identified the kind of omission that satisfies the "reckless disregard for the truth" requirement in the Franks test.  Mr. Baul must show that Supervisor Cronin "made statements or omissions that he 'knew [were] false, or would have known [were] false except for his reckless disregard for the truth." See Wilson, 212 F.3d

8

at 787 (citing <u>U.S. v. Leon</u>, 468 U.S. 897, 923 (1984)).  Although "[w]e cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip," as the court explained, the Fourth Amendment's "protection consists in requiring that . . . inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." <u>Id.</u> (citing <u>Johnson v. U.S.</u>, 333 U.S. 10, 13-14 (1948)).  Therefore, the court concluded:

> [O]missions are made with reckless disregard if an officer withholds a fact in his ken that "any reasonable person would have known that this was the kind of thing the judge would wish to know."

<u>Id.</u> at 788 (quoting <u>U.S. v. Jacobs</u>, 986 F.2d 1231, 1235 (8th Cir. 1993)).

Clearly, if, as Officer Kelly reported, Supervisor Cronin withheld from him the fact that Mr. Baul had sold his car to Demetrius Brown, that Brown had fled from the car just before the police discovered the drugs in the car, and that the police were looking for Mr. Baul because they wanted to confirm who had purchased the car from Mr. Baul, Supervisor Cronin omitted that information with reckless disregard for the truth.  Mr. Baul advances that common sense dictates that any reasonable person would have known that a judge making a probable cause determination as to the justification for a search of Mr. Baul's home would have wanted to know that he had sold the car, and that the police sought to interview him not because they suspected him of wrongdoing, but because they suspected the car's new owner of wrongdoing.

These omissions were clearly material to the determination as to whether or not there was reasonable suspicion to justify the administrative search of Mr. Baul's home.  When one factors this additional information into the reasonable suspicion analysis, it becomes clear that Mr. Baul had

nothing to do with the drugs discovered in the vehicle. Had Supervisor Cronin and Officer Kelly excluded the discovery of the drugs in the Lumina from their analysis, as they should have, they would have been left with the six technical violations, all relating to traffic violations and the failure of Mr. Baul to report the police contact related to these violations to his probation officer. Despite Officer Kelly's statement to the contrary during his testimony at the hearing, see Tr. at 43, these violations could not have served as an independent basis for an administrative search of Mr. Baul's residence, as they were not the types of violations which would give rise to a reasonable belief that further evidence associated with these violations would be found in Mr. Baul's home.

The Third Circuit's decision in Baker, 221 F.3d 438 (3d Cir. 2000), indicates that Mr. Baul's traffic violations could not have supplied Probation and Parole with the authority to search his home. In Baker, the defendant, a Pennsylvania state parolee, agreed to a condition of parole that forbade him from driving without a license. Id. at 439. Although he did not have a license, Baker drove to the parole office to visit with his parole officer. When an agent asked him whether he had a license, he reported that he did not, and parole officers arrested him when he attempted to drive away. They searched the passenger and glove compartments of the car and found that it was not registered to Baker. When they asked him how to open the trunk, he gave them the keys. Id. at 440. In the trunk, the officers found items that they suspected were drug paraphernalia, so they proceeded with a warrantless search of Baker's home, which produced drugs and weapons. Id. at 441.

The court found that the parole officers did not have reasonable suspicion to search the trunk.[4]

---

[4]As the court explained, upon arresting a suspect in his car, law enforcement officers may search the passenger compartment under New York v. Belton, 453 U.S. 454 (1981), but the scope of that search does not include the trunk. Baker, 221 F.3d at 443 (citing Belton, 453 U.S. at 460). Therefore, the search of the trunk violated the Fourth Amendment unless it was supported by the level of suspicion that the Fourth Amendment would require. Id. (citing Belton,

Id. at 442. As it explained, "neither Baker's violation of his parole by driving a vehicle or his failure

to document that he owned the vehicle can give rise to a reasonable suspicion that he was committing

other, unspecific, unrelated parole violations – the evidence of which might be found in the trunk."

By way of comparison, the court cited Knowles v. Iowa, 525 U.S. 113 (1998), in which the Supreme

Court said, "[o]nce [the defendant] was stopped for speeding and issued a citation, all the evidence

necessary to prosecute that offense had been obtained. No further evidence of excessive speed was

going to be found either on the person of the offender or in the passenger compartment of the car."

Baker, 221 F.3d at 445 (citing Knowles, 525 U.S. at 118). In addition, the court reasoned, the

Fourth Amendment required that the officers base their decision to search on "specific facts." Id. at

444 (citing U.S. v. Hill, 967 F.2d 902, 909 (3d Cir. 1992)). However, they did not base the search

on "'specific facts' giving rise to suspicion that there would be some evidence of a further violation

of parole in the trunk." Id. Even if the officers suspected at the time of the search that Baker was

driving a stolen car, "[t]here [was] little reason to think evidence of the car's rightful owner would

be found in the trunk." Id. at 444-445. On that basis, the court concluded that the evidence found

during the searches of both the trunk and Baker's home should have been suppressed. Id. at 449.

    During the suppression hearing in the present case, Officer Kelly testified that the objective

of the administrative search was to look for evidence of other violations of probation. With respect

to the technical violations, he testified that he and the other officers who conducted the search sought

"other evidences [sic] of unreported violations which maybe had occurred out of state which he did

not report." Tr. at 28. Aside from the obvious question as to why Officer Kelly thought that he

---

453 U.S. at 460-461). The Fourth Amendment would usually require probable cause, but in the
case of a parolee, it only requires reasonable suspicion. Id. (citing Griffin, 483 U.S. at 871-872).

might find evidence of out-of-state violations in Mr. Baul's home, Mr. Baul notes that this line of reasoning is exactly the same as that on which the probation officers relied in <u>Baker</u> to support their decision to search Baker's trunk.  As in <u>Baker</u>, Mr. Baul's traffic violations, while a technical violation of his conditions of probation, could not supply Probation and Parole with reasonable suspicion to search his home.  The court's reasoning in <u>Baker</u> suggests that probation and parole officers may only conduct a warrantless search of a probationer or parolee's car, or his home, on the basis of a violation if they believe they will find further evidence related to *that* violation in the place to be searched.  As in <u>Baker</u>, the nature of Mr. Baul's violations does not lend itself to the conclusion that he could have concealed further evidence of those violations in his home.  Taken in their totality, the circumstances and facts in this case did not provide reasonable suspicion to believe that evidence of any criminal wrongdoing would be found in Mr. Baul's residence.

> **2.      When factoring in information omitted by Supervisor Cronin, it is clear that Probation and Parole lacked reasonable suspicion to justify the search of Mr. Baul's home.**

When factoring in the information omitted by Supervisor Cronin, the facts of this case did not rise to reasonable suspicion to believe that evidence of criminal activity would be found in Mr. Baul's residence.  The government claims that Mr. Baul's numerous traffic violations, his failure to report these traffic violations and the related police contact to his probation officer, and the discovery of drugs in a car registered to Mr. Baul which had been sold, combined to justify the administrative search of Mr. Baul's residence.  <u>See</u> Gov't at 9.  However, none of these facts, even taken together, establish reasonable suspicion to believe that evidence of criminal activity would be found at Mr. Baul's residence, especially when you consider the other facts known to the members of the Governor's Task Force prior to the search, including the fact that Probation and Parole Officers had

knowledge that Mr. Baul had previously sold the car to another individual.

Although the Chevy Lumina was registered to Mr. Baul, Detective Looney informed the members of the Governor's Task Force with whom he spoke that Mr. Baul had sold the car.[5] Tr. at 84-86, 90-91. In fact, Detective Looney testified that he never arrested Mr. Baul on any charges relating to the drugs found in the car, believing the drugs belonged to Demetrius Brown, and not to Mr. Baul. Tr. at 82, 84, 85. Supervisor Cronin, who asked Officer Kelly to conduct the search, was aware of the fact that Demetrius Brown was seen fleeing from the Lumina just before the police discovered the drugs inside of it. Tr. at 37, 77-78. Furthermore, both Officer Kelly and Supervisor Cronin were aware of the fact that Mr. Baul had never been arrested or convicted for any type of drug offense. Tr. at 35. Given these facts, the government can point to nothing that supports a belief that Mr. Baul had anything to do with the drugs that were found inside the Lumina. Therefore, the discovery of drugs in the Lumina should not be factored into the analysis as to whether reasonable suspicion existed to search Mr. Baul's residence.

### 3.    The good-faith exception is inapplicable in this case.

In U.S. v. Leon, 468 U.S. 897, 900 (1984), the Supreme Court modified the Fourth Amendment exclusionary rule "so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." The Court called this the "good-faith exception." Id. at 919 n. 19.

---

[5]Detective Looney recalls personally speaking to someone on the Governor's Task Force regarding his investigation of Demetrius Brown and the Chevy Lumina, and believes it may have been Probation Officer Kelly or Trooper Popp that he spoke to. Tr. at 85. Both Officer Kelly and Trooper Popp participated in the administrative search of Mr. Baul's home.

13

The Supreme Court focused on what it saw as the purpose of the exclusionary rule – to deter officials in the criminal justice system from violating individuals' constitutional rights in order to obtain evidence of their criminal activity.  See id. at 908 ("[Any] rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness") (quoting Illinois v. Gates, 462 U.S. 213, 257-258 (1983)).  The Court determined that in "situations in which the police have reasonably relied on a warrant issued by a detached and neutral magistrate but later found to be defective," see id. at 913 n. 9, the exclusion of evidence seized during the search authorized by that warrant will have no deterrent effect on the issuing judge or magistrate.  Id. at 916. Similarly, the exclusion of evidence will only have a deterrent effect on the officers who executed the search or applied for a search warrant if they "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  Id. at 919 (quoting U.S. v. Peltier, 422 U.S. 531, 539 (1975).

Although Supervisor Cronin, in essence, played the role of the magistrate in this scenario, it cannot be argued that Officer Kelly "reasonably relied" on Cronin's authorization for the search within the meaning of the good-faith exception in Leon.  The Leon Court touted the "neutral magistrate" as "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" Id. at 913-914 (citing U.S. v. Chadwick, 433 U.S. 1, 9 (1977) (quoting Johnson v. U.S., 333 U.S. 10, 14 (1948)), to whom the courts should afford "great deference" in analyzing his determination of reasonable suspicion.  See Spinelli v. U.S., 393 U.S. 410, 419 (1969).  In Leon, the Court felt confident that it could rely on the neutral and detached determinations of magistrates because

14

"[j]udges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular prosecutions." Id. at 916.  Nothing could be further from the truth in Mr. Baul's case.  Supervisor Cronin, as the supervisor of numerous probation and parole officers, clearly has a stake in the outcome of particular prosecutions, and is more than a mere adjunct to the law enforcement team – he is a supervising member of that team.

This Court's admission of evidence obtained pursuant to Supervisor Cronin's authorization, when that authorization is erroneously given, would certainly reduce his incentive to comply with the Fourth Amendment and to grant all colorable requests for authorization to search probationers' homes.  If, as testified to by Officer Kelly, Supervisor Cronin neglected to share with Officer Kelly the information that he received regarding Demetrius Brown, and the Court nevertheless rules that the search of Mr. Baul's home was founded on reasonable suspicion, it will reduce Cronin's incentive to comply with the Fourth Amendment when it comes to approving administrative searches of probationers' homes.  Supervisor Cronin, unlike the hypothetical magistrate in Leon, supplied the information on which Officer Kelly relied in seeking permission to search Mr. Baul's home.

The Court went on to state in Leon that the good-faith exception will not apply in cases where "the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales , Inc v. New York, 442 U.S. 319 (1979).  In Lo-Ji Sales, the local town justice who approved the issuance of the search warrant in that case, also undertook to "telescope the processes of the application" for the search warrant and participated with the police in its execution.  Id. at 328.  The Court found it "difficult to discern when [the local town justice] was acting as a "neutral and detached" judicial officer and when he was one with the police and prosecutors in the executive seizure." Id.  The Court found that the town justice in that case was not acting as a neutral and

detached magistrate when he approved the search warrant in that case. Similarly, in the case at bar, Supervisor Cronin cannot be said to be acting as a "neutral and detached magistrate" when he approved the administrative search of Mr. Baul's residence, for it was Supervisor Cronin who initially approached Officer Kelly with the information concerning Mr. Baul and it is clear from the record that Supervisor Cronin had a stake in the outcome of the investigation involving Mr. Baul.

Even if this Court finds that Officer Kelly reasonably relied on his supervisor's grant of permission, the government still cannot invoke the good-faith exception here because "it is beyond question that the police cannot insulate a deliberate falsehood from a <u>Franks</u> inquiry simply by laundering the falsehood through an unwitting affiant who is ignorant of the falsehood." <u>See</u> <u>U.S. v. Shields</u>, 458 F.3d 269, 276-277 (3d Cir. 2006) (citing <u>Franks</u>, 438 U.S. at 164 n. 6; <u>Calisto</u>, 838 F.2d at 714). If Supervisor Cronin withheld the information about Demetrius Brown from Officer Kelly, Probation and Parole may not nevertheless benefit from the good-faith exception because Officer Kelly, the officer who sought permission to conduct the search and led the search team, was unaware of the fact that Mr. Baul no longer owned the car in which the drugs were found.

Finally, even if Supervisor Cronin did not withhold the information, the government may not claim that the good-faith exception applies because, armed with the knowledge that Mr. Baul no longer owned the Lumina and that Demetrius Brown had possession of the car right before the drugs were found, Officer Kelly either would or should have known that he lacked reasonable suspicion to search Mr. Baul's home. As <u>Leon</u> makes clear, if Officer Kelly knew that the search was unconstitutional, his reliance on Supervisor Cronin's authorization on the search was entirely unreasonable. <u>See</u> <u>Leon</u>, 468 U.S. at 919.

As the Supreme Court makes clear, the <u>Leon</u> good faith exception is inapplicable to <u>Franks</u>

violations, because the purpose of the exclusionary rule is to deter police misconduct and/or incompetence. Law enforcement cannot rely on their own error to establish good faith. In <u>Leon</u>, the Court made clear that admissibility of illegally seized evidence is not assured merely by the good faith of the executing officer. "It is necessary to consider the objective reasonableness, not only of the officers who eventually executed the warrant, but also of the officers who originally obtained it or who provided information material to the probable cause determination." <u>Leon</u> at 922 n. 24. Whether Supervisor Cronin withheld from Officer Kelly material information, or Officer Kelly armed with the information chose to ignore it, <u>Leon</u> and its progeny make clear that the good-faith exception is inapplicable in the present case.

II.     **By failing to adhere to the Delaware Department of Corrections' procedure for administrative searches of probationers' homes, the Governor's Task Force violated Mr. Baul's Fourth Amendment right to be free from unreasonable searches and seizures.**

Although the government argues in its opening brief that Officer Kelly's failure to secure written permission for the second search attempt does not affect the Fourth Amendment analysis, Supervisor Cronin's verbal authorization, if given, was insufficient to satisfy the Fourth Amendment. Procedure 7.19 requires the officer who intends to conduct a search to review the case with his supervisor, who approves the search by signing and dating an Arrest-search Checklist. <u>See</u> Gov't Attachment A, p. 5. According to that document, "[t]he Arrest-search Checklist expires 24 hours after the date and time the Supervisor signed the form; unless, [sic] the Supervisor extends the period by writing-in [sic] an expiration date, time, and initialing." <u>Id.</u> Although Officer Kelly indicated at the hearing that Supervisor Cronin "gives [officers] an indefinite amount of period to carry out the search," Tr. at 32, he admitted that if Officer Cronin did not reauthorize the search according to

17

procedure before the search occurred, his "authorization would have expired." Tr. at 39. In addition, the Arrest-search Checklist itself indicates more specifically that "authorization expires in 24 hours from supervisor's date/time; unless an optional expiration date/time is entered." See Government's Exhibit 3. Officer Kelly acknowledged that Supervisor Cronin did not enter an "optional expiration date and time" on the administrative warrant. Tr. at 40. Therefore, the Governor's Task Force did not follow procedure, and Mr. Baul submits that the search of his home violated the Fourth Amendment.

Under Delaware state law, the failure of Probation and Parole to adhere to its procedural requirements in searching a probationer's home constitutes a constitutional violation. In State v. Harris, 734 A.2d 629 (Del. Super. 1998), after finding Procedure 7.19 valid, the Delaware Superior Court determined that "[f]ailure to comply with procedures, which are presumptively valid, would violate the 'reasonableness' requirement within the meaning of the Fourth Amendment of the United States and would warrant granting Defendant's Motion to Suppress." Id. at 635. This Court is bound by that interpretation of the Procedure because, as the Supreme Court said of the Wisconsin regulation in Griffin, "we must take that regulation as it has been interpreted by state corrections officials and state courts." Griffin, 483 U.S. at 875. If, as Mr. Baul contends, Officer Kelly and Supervisor Cronin did not satisfy the administrative warrant requirements, this Court must grant the Motion to Suppress.

The government relies on Fuller v. State, 844 A.2d 290 (Del. 2004), to argue that Probation and Parole's lack of compliance with Procedure 7.19 did not violate the Fourth Amendment. In Fuller, probation officers received a tip that Fuller, a probationer, possessed a gun and had been selling crack-cocaine in Wilmington out of a particular car that the informant described to them.

18

Fuller, 844 A.2d at 290.  A group of probation and police officers spotted the car, flagged it down, and searched it, finding two bags of crack.  Id.  Fuller challenged the search on the grounds that the probation officer did not use the Arrest-search Checklist or conduct a face-to-face conference with his supervisor to obtain permission to search the car.  Id. at 291.  The court determined that although the officers did not adhere to departmental guidelines, their search of the car was reasonable "because of the curtailed rights of a probationer as compared with an ordinary citizen."  Id. at 292.  The court also noted that "[t]he purpose of the regulations is to ensure that the Department has sufficient grounds before undertaking a search," and fond that the officers had followed the parts of the regulations that impact the Fourth Amendment reasonableness inquiry.  Id. at 292.  In addition, and perhaps more importantly, the officers also had probable cause to believe that the vehicle contained contraband at the time they stopped it, so the reasonable suspicion analysis was unnecessary to justify the search.  See id.  Based on this line of thinking, the government argues here that "[b]ecause the Delaware Supreme Court is the final authority on the interpretation of Delaware law," which Mr. Baul does not dispute, "the search procedures in this case cannot have violated section 4321(d), even if Supervisor Cronin and Officer Kelly did not comply with P[rocedure] 7.19 when Supervisor Cronin gave verbal approval on December 14."  See Gov't at 13.

The government fails to recognize a major difference – one with constitutional significance – between the search in Fuller and the one in Mr. Baul's case: the search in Fuller involved an automobile.  Since 1925, the Supreme Court has recognized an exception to the search warrant requirement for automobiles, see Carroll v. U.S., 267 U.S. 132, 151 (1925); U.S. v. Ross, 456 U.S. 798, 805-806 (1982) (citing Carroll, 257 U.S. 132), based on "the nature of an automobile in transit." Ross, 456 U.S. at 806-807.  In contrast, in Kyllo v. U.S., 533 U.S. 27 (2001), a case that concerned

19

the search of a home for marijuana using thermal-imaging technology, the Court vehemently emphasized the difference between a search of a citizen's home and all other searches. See id. at 31 ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'") (quoting Silverman v. U.S., 365 U.S. 505, 511 (1961)); id. at 37 ("[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much") (quoting Silverman, 365 U.S. at 512); id. at 40 ("We have said that the Fourth Amendment 'draws a firm line at the entrance to the house' . . . That line, we think, must be not only firm but also bright") (internal citations omitted). Although Mr. Baul's status as a probationer reduces the level of protection he may seek under the Fourth Amendment, as the government recognizes, "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" Gov't at 6 (quoting Griffin, 483 U.S. at 873). Based on Griffin and Kyllo, therefore, Mr. Baul argues that although he has a lesser expectation of privacy in his home than ordinary citizens, his home enjoys heightened protection under the Fourth Amendment. He respectfully advances that this Court should not apply Fuller to his case.

The government also relies on U.S. v. Caceres, 440 U.S. 741 (1979), to argue that "Delaware's Probation policies create no private right for the defendant." Gov't at 11. It uses Caceres to support the proposition that the Governor's Task Force could not have violated Mr. Baul's Fourth Amendment rights by failing to comply with Procedure 7.19. Its reliance on this case is misplaced for several reasons. First of all, Caceres concerned the admissibility of evidence obtained in violation of IRS regulations which required IRS agents to obtain permission to record conversations with subjects of federal investigations. Caceres, 440 U.S. at 743. The Caceres Court

20

indicated that "[n]either the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents." Id. at 744. However, Procedure 7.19 does require that probation officers obtain the approval of a supervisor before searching a probationer's home, and as stated, Delaware law requires compliance with that requirement.

Second, the Caceres Court noted that "the Constitution [does not] protect the privacy of individuals in respondent's position." Id. at 750. In other words, the Constitution does not protect the privacy of the targets of IRS investigations whose conversations the IRS may wish to record. However, the Constitution does protect the privacy of individuals in Mr. Baul's position. As explained, it requires that probation officers have reasonable suspicion before searching a probationer's home for contraband.

Finally, Caceres concerned the enforceability of federal regulations that Congress enacted to govern the Executive Branch. The concerns that such an analysis implicates have no place in Mr. Baul's case, which concerns Delaware regulations.[6] For all of these reasons, Caceres is inapposite here.[7]

---

[6]Should there be any doubt about Mr. Baul's contention that Caceres concerns only federal regulations, and not state regulations, one need only look at pages 753 and 754 of the Caceres opinion to confirm it. The Court discusses the potential applicability of the Administrative Procedure Act ("APA"), codified at 4 U.S.C. §§ 551 et seq. at 701 et seq., concluding that it "provides no grounds for judicial enforcement of the regulation violated in this case." See Caceres, 440 U.S. 753-754. The APA, by its terms, governs only federal agencies. See § 551 ("For the purpose of this subchapter – (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency").

[7]The government also engages in a discussion regarding the viability of any potential due process or equal protection claims in Mr. Baul's case. See Gov't at 13. Although Mr. Baul raises neither claim, it should be noted that this analysis originated in Caceres, as the government

21

The government also briefly mentions Samson v. California, stating that Samson established

the principle that "a state may even impose a 'suspicionless' search regimen and still comply with the

[c]onstitutional reasonableness requirement."  Gov't at 12 (citing 126 S. Ct. 2193 (2006)).  This

misleading summary of the holding in Samson omits the key ingredients in the California parole

system at issue in Samson that distinguish it from the probation system in Mr. Baul's case.

First, the government neglects to mention that the California statute at issue in Samson, which

applied only to parolees, specifically provided that parole and other peace officers could search

parolees without reasonable suspicion, unlike Procedure 7.19.  See Samson, 126 S. Ct. at 2196 ("Any

inmate who is eligible for release on parole pursuant to this chapter shall agree in writing to be subject

to search or seizure by a parole officer or other peace officer at any time of the day or night, with or

without a search warrant and with or without cause") (quoting Cal. Penal Code Ann. § 3067(a))

(emphasis added).  Although the government recounts the discussion of recidivism in Knights at

length, see Gov't at 7, 9, the Samson Court made the difference between parolees and probationers

very clear in its discussion of Knights.  In fact, it discussed the problem of recidivism solely in the

context of parolees.  For instance, the Court discussed at length the characteristics of parolees that

necessitate the kind of intrusions on their liberty that would not be tolerated if applied to the general

public.  See Samson, 126 S. Ct. at 2201.  The court noted that "most parolees require intense

supervision" in order to assist them in their reintegration into society, and pointed out the fact that

acknowledges, id. (citing Caceres, 440 U.S. at 752-753), and does not apply to Mr. Baul's case
either, for the same reasons explained above.  Caceres concerns the failure of a federal
government agency to comply with regulations that neither Congress nor the Constitution
required it to establish or to follow, whereas Mr. Baul argues that Probation and Parole failed to
comply with procedures that the Delaware Department of Corrections issued pursuant to the
State of Delaware's request, and that it violated his rights under the Fourth Amendment by doing
so.

"parolees, <u>in contrast to probationers</u>, 'have been sentenced to prison for felonies and released before the ends of their prison terms' and are 'deemed to have acted more harmfully than anyone except those felons not released on parole.'" <u>Id.</u> (citing <u>U.S. v. Crawford</u>, 372 F.3d 1048, 1077 (9th Cir. 2004)) (emphasis added).

In addition, the <u>Samson</u> Court clearly intended that its analysis apply only to searches under the California statute and others like it.  It "granted certiorari to decide whether a suspicionless search, <u>conducted under the authority of [the California] statute</u>, violates the Constitution." <u>Id.</u> at 2196 (emphasis added).  To make it even more clear that the decision applied only to suspicionless search regimes, the Court admonished Samson for arguing that "California's system is constitutionally defective by comparison" with those in the majority of states in the U.S., as well as the federal probation and parole system.  Samson noted that in those jurisdictions, authorities "have been able to further similar interests in reducing recidivism and promoting re-integration, despite having systems that permit parolee searches based upon some level of suspicion." <u>Id.</u> at 2201.  The Court stated, "Petitioner's reliance on the practices of jurisdictions other than California, however, is misplaced. That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether <u>California's</u> supervisory system is drawn to meet its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy." <u>Id.</u> (emphasis added).  Thus, contrary to the government's implication that the search of Mr. Baul's residence could be upheld under state or federal law, even without reasonable suspicion, <u>Samson</u> simply stands for the proposition that states may choose not to require reasonable suspicion to support the search of a parolee.  It does not suggest that individualized suspicion is never required. Therefore, the government may not rely on <u>Samson</u> to justify the suspicionless search of Mr. Baul's

home.

Finally, the government suggests that the Governor's Task Force's failure to adhere to Procedure 7.19's requirements has no effect on the reasonableness of the search under the Fourth Amendment because the Third Circuit has noted that <u>Knights</u> "offer[s] a second and discrete path to justifying the search that does not depend on the requirements of the state probation/parole search regimen . . . [w]here a probationer has agreed to the 'salient circumstances' of a search condition." Gov't at 14 (citing <u>U.S. v. Williams</u>, 417 F.3 373, 378 (3d Cir. 2005); <u>Knights</u>, 534 U.S. at 119). However, <u>Williams</u> concerned the Pennsylvania provisions that govern administrative searches, rather than the Delaware provisions, and as explained earlier, Officer Kelly and Supervisor Cronin lacked reasonable suspicion to support the search of Mr. Baul's home. Therefore, neither <u>Williams</u> nor <u>Knights</u> adds anything to the discussion in that context.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated herein, and any other reasons that are apparent to the Court, the defense respectfully requests that any evidence seized as a result of the illegal search of Mr. Baul's residence, and in violation of his Constitutional rights, be suppressed.

Respectfully Submitted,


<u>/s/                                 </u>
Eleni Kousoulis, Esquire
Acting Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware 19801
Attorney for Defendant Rashan Baul


Date:   November 13, 2006

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 06-06-KAJ |
| | : | |
| | : | |
| RASHAN BAUL, | : | |
| | : | |
| Defendant. | : | |

## **CERTIFICATE OF SERVICE**

Undersigned counsel certifies that a copy of Defendant's Reply To Government's Post-Hearing Opening Brief On Defendant's Motion To Suppress is available for public viewing and downloading and was electronically delivered on November 13, 2006, to:

Douglas McCann, Esquire
Assistant U.S. Attorney
1007 Orange Street
Suite 700, P.O. Box 2046
Wilmington, DE   19899-2046


/s/_____
Eleni Kousoulis, Esquire
Acting Federal Public Defender
704 King St., Suite 110
Wilmington, Delaware  19801
Attorney for Defendant Rashan Baul